UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MIKE'S TRAIN HOUSE, INC.,

     Plaintiff,

vs.

Case No. 00-CV-71729

LIONEL L.L.C.,
KOREA BRASS CO., LTD., and
YOO CHAN YANG, , ✔

     Defendants.

Judge John Corbett O'Meara

---

Harold Gurewitz (P14468)
Margaret M. Raben (P39243)
GUREWITZ & RABEN, P.C.
Attorneys for Plaintiff
333 West Fort Street, Suite 1100
Detroit, Michigan 48226
(313) 628-4740

Charles J. Bloom
STEVENS & LEE, P.C.
Attorneys for Plaintiff
One Glenhardie Corporate Center
1275 Drummers Lane
Wayne, Pennsylvania 19087-0236
(610) 293-4973

Jeffrey D. Bukowski
STEVENS & LEE, P.C.
Attorneys for Plaintiff
111 North Sixth Street
Reading, Pennsylvania 19603-0679
(610) 478-2215

Joseph H. Hickey (P41664)
Marilyn A. Peters (P32095)
Patrick F. Hickey (P36648)
Dante A. Stella (P60443)
DYKEMA GOSSETT PLLC
Attorneys for Defendants
1577 North Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304
(248) 203-0555

---

## FIRST AMENDED COMPLAINT

     Plaintiff, Mike's Train House, Inc. ("MTH"), by counsel, seeks a temporary restraining order, preliminary and permanent injunctive relief, and damages against the defendants, Lionel L.L.C. ("Lionel"), Korea Brass Co., Ltd. ("Korea Brass"), and Yoo Chan Yang ("Yang"). In support of this action, MTH states as follows:

1

## The Parties

1.    Plaintiff MTH is a corporation organized and existing under the laws of the State of Maryland. MTH's principal place of business is 7020 Columbia Gateway Drive, Columbia, Maryland 21046.

2.    MTH is in the business of manufacturing and marketing model trains and accessories to the public. MTH's customers include beginner rail enthusiasts as well as avid collectors of model trains.

3.    One of MTH's principal competitors is Lionel.

4.    Defendant Lionel is a limited liability company organized and existing under the laws of the State of New York. Lionel's New York registered address is 620 Fifth Avenue, Suite 216, New York, New York 10020. Lionel's principal place of business is 50625 Richard W. Boulevard, Chesterfield, Michigan 48051.

5.    Lionel was originally formed in 1900 and today claims to be the world's largest manufacturer and marketer of model trains and accessories.

6.    Defendant Korea Brass is a Korean company that has been engaged since 1998 to manufacture model trains for Lionel. Prior to that time, Korea Brass had not manufactured any quality die-cast scale model trains.

7.    Korea Brass regularly conducts business in the United States through its United States office, which is located at 2525 Thrush Road, Charlottesville, Virginia 22901.

8.    Defendant Yang is an individual naturalized citizen of the United States who resides at 2525 Thrush Road, Charlottesville, Virginia 22901.

9.    Yang is an employee and/or an agent of Korea Brass whose primary responsibility is coordinating Korea Brass' business in North America and Europe and

2

communicating with Korea Brass' customers in those locations.  Korea Brass pays Yang 4% of its total gross sales into the United States.

## Jurisdiction and Venue

10.    The Court has subject matter jurisdiction of this lawsuit under 28 U.S.C. § 1331 (federal question jurisdiction) because plaintiff's third claim for relief arises under the laws of the United States, 15 U.S.C. § 1125 (the Lanham Act); under 28 U.S.C. § 1367 (supplemental jurisdiction) because plaintiff's other claims for relief form part of the same case or controversy under Article III of the United States Constitution; and under 28 U.S.C. § 1332 (diversity jurisdiction) because the entire dispute is between citizens of different states and the amount in controversy, excluding interest and costs, exceeds $75,000.

11.    The Court has personal jurisdiction over Lionel in this lawsuit under the Michigan long-arm statute, MICH. STAT. ANN. §§ 27A.711(3), and/or 27A.721(3), and/or 27A.731(3) (Law. Co-op. 1999) because Michigan is Lionel's principal place of business, Lionel carries on a continuous and systematic part of its business in Michigan, and because Lionel agreed in writing that any claims by MTH against Lionel could be brought in this Court.

12.    The Court has personal jurisdiction over Korea Brass in this lawsuit under the Michigan long-arm statute, MICH. STAT. ANN. §§ 27A.715(1), (2), (5), and/or 27A.725(1), (2), (5), and/or 27A.735(1), (2), (5) because MTH's claims arise out of Korea Brass' transaction of business in Michigan, or doing or causing acts to be done, or consequences to occur, in Michigan, resulting in an action for tort, or entering into a contract for services to be rendered, or materials to be furnished, in Michigan.

13.    The Court has personal jurisdiction over Yang in this lawsuit under the Michigan long-arm statute, MICH. STAT. ANN. §§ 27A.705(1), (2), (5) because MTH's claims

3

arise out of Yang's transaction of business in Michigan, or doing or causing acts to be done, or consequences to occur, in Michigan, resulting in an action for tort, or entering into a contract for services to be rendered, or materials to be furnished, in Michigan.

14. Korea Brass and Yang regularly and purposefully do or solicit business in the State of Michigan and derive substantial revenue from goods, services, or manufactured products sold, used or consumed in the State of Michigan. Specifically, in the past year, Korea Brass, through Yang, have sold and delivered thousands of model trains, worth over $3,000,000, to Lionel in Michigan for sale into interstate commerce. This year, Korea Brass, through Yang, intends to sell and deliver thousands more model trains, worth over $11,000,000, to Lionel in Michigan for sale into interstate commerce.

15. To facilitate sales from Korea Brass to Lionel, Yang and Korea Brass Representative Director (the equivalent of Chief Executive Officer) Sung-Won Cho have made numerous personal visits to Lionel in Michigan and have communicated with Lionel in Michigan on an ongoing and regular basis. During one or more of those trips, Sung-Won Cho and Yang delivered information containing MTH's confidential and proprietary trade secrets to Lionel. Thus, this Court's exercise of personal jurisdiction over Korea Brass and Yang would not offend traditional notions of fair play and substantial justice.

16. This judicial district is the appropriate venue for this lawsuit under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to MTH's claims occurred in this judicial district or, alternatively, under 28 U.S.C. § 1391(a)(3) because Lionel, Korea Brass, and Yang are subject to personal jurisdiction in this judicial district.

4

## Background

17.    MTH has introduced the world of model railroading to many new hobbyists by producing trains and accessories that are unique, appealing, simple to operate, built to last, and fairly priced.

18.    MTH also has encouraged the enthusiasm and excitement of long-time model railroaders by presenting an ever growing variety of engines, rolling stock, passenger cars, and accessories to meet the requests of just about any collector or model railroad operator.

19.    The model train industry is highly competitive. MTH has been successful by providing its customers with what it believes to be a better quality product when compared to the same item offered by competitors, and at a lower price.

20.    MTH has gained market share by developing what it believes to be better model train designs than its competitors, and by providing more detail, and new features that its competitors' model trains do not offer.

21.    The realistic looking features of MTH's model trains have been a primary selling point of MTH's trains over the past 15 years.

22.    The realistic look of MTH's model trains has made MTH's model trains unique in the model train industry and, as a result, MTH has had a competitive advantage over its competition, including Lionel.

23.    MTH has spent millions of dollars researching and developing its own designs, drawings, and tooling for each model to achieve the unique and realistic look associated with MTH's model trains.

24.    MTH's lead time from concept, to design, to manufacture of any single model train is approximately one year. This lead time has been considerably decreased after years of manufacturing model trains.

5

25.    Collectors of model trains enjoy being able to purchase new design models as soon as they are available on the market. Therefore, in the model train industry, the company that is first to reach the market with a certain model train has a significant advantage over its competition for the sale of that model.

26.    MTH takes great care in deciding which model trains it will design, develop and manufacture. In addition, MTH releases only a few new model trains at any given time.

27.    Once MTH determines which new model trains it will introduce, it prepares a production schedule setting forth the timing for each new model's design, tooling, manufacture, and release.

28.    The lead time of approximately one year that it would take for one of MTH's competitors to legitimately reverse engineer one of MTH's model trains gives MTH a significant advantage over its competition because, for that one year period, MTH will have the ability to exclusively sell that particular model train to the collecting public for a price that reflects its limited availability.

### MTH's Relationship With Korean Company Samhongsa

29.    Since about 1985, MTH has contracted with a Korean company, Samhongsa Company, Inc. ("Samhongsa"), for the manufacture of its model trains.

30.    During that time, MTH has worked with Samhongsa and spent millions of dollars to learn and develop the process to design and produce the designs and tooling to make realistic looking model trains. MTH and Samhongsa have developed, through research and development, a substantial body of technical knowledge or "know-how" ("R&D Technical

6

Know-How") regarding the process, design, and production of model trains. This R&D Technical Know-How is the property of both MTH and Samhongsa.

31. In addition, MTH has developed drawing and design packages ("Drawing and Design Packages") to enable Samhongsa to build, exclusively for MTH, the most realistic looking "O" Gauge and Standard Gauge model trains, with the most features, in the industry. MTH's Drawing and Design Packages include, but are not limited to, computer aided design ("CAD") drawings, part drawings, lost wax casting drawings, tooling drawings, general overall drawings ("GODs"), molds, and the tooling itself.

32. Taken together, MTH's R&D Technical Know-How and Drawing and Design Packages describe in detail the materials, methods, process, and "know-how" – in other words, the recipe – MTH uses to manufacture realistic looking, die-cast metal model trains.

33. MTH's production schedules ("Production Schedules") list the specific model trains that MTH intends to introduce to the market, when those trains will be introduced, and certain critical milestone dates relating to each such model. MTH's Production Schedules also show the projected quantities that MTH intends to produce, which information is just as valuable as the name of the model itself.

34. Over the years, MTH has developed a substantial body of knowledge regarding the costs involved in making high-quality and realistic looking die-cast metal model trains ("Cost Information").

### FIRST CLAIM FOR RELIEF
**Misappropriation of Trade Secrets - Uniform Trade Secrets Act and/or Common Law
(Against All Defendants)**

35. MTH incorporates by reference paragraphs 1 through 34 above as though set forth fully herein.

7

## MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, And Cost Information Are Trade Secrets

36.    MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information constitute trade secrets, as defined in the Uniform Trade Secrets Act. See MICH. STAT. ANN. § 19.902(d) (Law. Co-op 1999).

37.    MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information derive independent economic value from not being generally known, and not readily ascertainable by proper means by other persons who can obtain value from their disclosure or use.

38.    MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information are highly valuable to MTH and constitute a significant source of MTH's income and a significant competitive advantage over its competition, including, but not limited to, Lionel.

39.    MTH has devoted substantial sums of money to researching, developing, and creating its Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information. Others could not duplicate MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information, if at all, without using the trade secrets, processes and other information developed solely by MTH and its agents, servants, and employees; or undertaking the same lengthy and expensive process as MTH.

## MTH And Samhongsa Have Protected The Confidentiality Of MTH's Trade Secrets

40.    MTH and Samhongsa at all times have maintained strict security precautions to preserve the secret, confidential, and proprietary nature of MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information.

8

41.    MTH has developed and maintained a password guarded computer system to restrict access to MTH's confidential and proprietary trade secret information, including its Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information, to MTH employees on a "need to know" basis.  In addition, certain key MTH employees have signed agreements requiring them to maintain the confidentiality of the information they learn while employed by MTH, and not to compete with MTH for a period of time after they leave MTH's employment.

42.    MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information were kept by Samhongsa in a secure location with only restricted access.

43.    Samhongsa's employment agreements require its employees to refrain from using any confidential information they learn while employed at Samhongsa.  In addition, Samhongsa has required that employees sign confidentiality agreements prohibiting the employees from using any confidential information they learn while employed by Samhongsa after they leave Samhongsa's employment.

44.    The Samhongsa employees with access to information containing MTH's confidential and proprietary trade secrets, including but not limited to, Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information, were aware that this information was secret and was not to be divulged to anyone else or taken out of Samhongsa's facilities.

45.    At Samhongsa, MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information were stored on computers, or in locked storage cabinets, with access limited to only those persons with a need to know such information in the performance of their job duties.

9

46.    Samhongsa required its subcontractors to sign confidentiality agreements prohibiting the subcontractors from using or disclosing to others any confidential information, trade secrets, or know-how they learn during their contractual relationship with Samhongsa. Upon termination of the contractual relationship, Samhongsa's subcontractors are required to return any confidential information provided to them during the term of the contract.

47.    From approximately April 1994 through approximately January 1998, Wan-Ki Precision Tooling ("Wan-Ki") was a sub-contractor of Samhongsa which made tooling for MTH's engines manufactured by Samhongsa during that period of time.

48.    Upon termination of the relationship between Samhongsa and Wan-Ki, Wan-Ki was supposed to return to Samhongsa all of the tooling and tooling drawings used for MTH's engines.

## Korea Brass, Through Yang, Communicated MTH's Stolen Trade Secrets To Lionel

49.    Between 1998 and the present, Yang communicated with Lionel and Korea Brass on a regular basis, by telephone, electronic mail, and in person, to facilitate the manufacture of model trains by Korea Brass for Lionel.

50.    Despite the efforts of MTH and Samhongsa to maintain the secrecy of information relating to the production of MTH's model trains, during many of Yang's communications with Lionel, Yang conveyed to Lionel MTH's confidential and proprietary trade secret information, including but not limited to, information relating to MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information.

51.    Yang obtained most, if not all, of MTH's confidential and proprietary trade secret information directly from Korea Brass Representative Director Sung-Won Cho.

52.    In or before April 1999, Yang provided Lionel with price quotes for MTH's model trains containing MTH's secret Cost Information. Yang obtained this information directly from Korea Brass Representative Director, Sung-Won Cho.

53.    In July 1999, Korea Brass and Yang provided Lionel with a marketing document that contained confidential and sensitive information relating to the specific types of model trains and the quantities of those trains that MTH intended to produce. This confidential information was taken directly from MTH's Production Schedules. Yang obtained this confidential information directly from Korea Brass Representative Director Sung-Won Cho.

54.    On or about August 2, 1999, Yang and Sung-Won Cho traveled to Michigan to meet with Lionel officers to discuss the marketing document referred to in the previous paragraph.

55.    On or about August 6, 1999, Yang provided Lionel with a list of the following projects done by MTH and suggested that Lionel should consider doing these projects as well: Scale ATSF 4-8-4, Scale Challenger, Scale NYC Hudson 4-6-4, Scale PRR K-4, Scale SP Cab Forward, Scale Daylight GS-4, Scale DM&IR 2-8-8-4, Scale Empire State Express, Scale N&W J, Scale New Jersey Blue Comet, Scale Southern PS4, Scale USRA Y3 Scale USRA Y6B, Baby Allegheny, Baby Big Boy, Baby NYC J3A, Baby Berkshire 2-8-4, Baby Commodore Vanderbilt, Baby General 4-4-0, Baby General Texas 4-4-0, Baby Hudson Hiawatha, Baby N&W J, Baby K4, Baby NYC L3, Baby Southern PS4, Baby SP Daylight GS-4, Baby SP Daylight GS-4 auxiliary tender, and Baby Torpedo.

56.    The name "Baby" in some of the model trains listed above is Lionel's designation to indicate that those particular trains are semi-scale models, the equivalent of which MTH sells under its trademarked designation "RailKing."

11

57.    Yang informed Lionel that the design time for any or all of the above listed projects would be "very short" because Korea Brass' designer, Soon-Kap Ahn, was "very familiar with them."  Soon-Kap Ahn had worked on these projects for MTH when he was employed by Samhongsa.

58.    On September 5, 1999, Yang informed Lionel that Korea Brass had sent a package to Lionel containing, among other things, drawings and semi-scale die-cast boiler bodies for the Challenger, Allegheny, Hiawatha, and Southern Crescent engines.

59.    Also on September 5, 1999, Yang informed Lionel that tooling drawings for the above listed engines, and "many others," were available from "our tooling vendor" "so they can make tools in a very short period of time."

60.    All but one of the above listed engines were manufactured by MTH and Samhongsa through Samhongsa's tooling subcontractor Wan-Ki.  The tooling for the other engine was made by a tooling subcontractor named Yoo-Dae, which is now doing business under the name Koryo Precision.  Koryo Precision built tooling for Lionel's Camelback engine.

61.    Between April 1994 and January 1998, Wan-Ki made the tooling for each of the following MTH engines: Scale GP-30, Scale SD-45, Scale SD-7/9, Scale Gas Turbine, RailKing F-3, RailKing Dash-8, RailKing SD-60, Scale FP-45, RailKing UP Gas Turbine, RailKing SD-90 Mac, Scale UP DD40X, RailKing L-3 Tender, Scale NYC Empire State Express, RailKing N&W J, RailKing C&O Allegheny, RailKing Southern Crescent, RailKing Hiawatha, and Scale 70-ft. Passenger Car Set.

62.    Thus, the tooling drawings that Yang told Lionel were available from its tooling vendor were, in fact, MTH's tooling drawings, which are part of MTH's Drawing and Design Packages.

12

## The Theft of MTH's Designs and Drawings

63.    Sometime between September 1998 and October 1999, former Samhongsa employees, Soon-Kap Ahn, Bok-Dong Jeung, and Byong-Ki Kwak; and Korea Brass employee, Heung-Bo Shim, on behalf of Korea Brass and/or Lionel, stole MTH's trade secrets, including but not limited to MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information, from Samhongsa's facilities in Seoul, Korea.

64.    One or more of the individuals identified in the preceding paragraph copied files from Samhongsa's computer system onto disks, removed the files from Samhongsa's facility, and loaded the files onto the computers of the chief of design for Korea Brass. Information from the Drawing and Design Packages for at least eleven different MTH model trains were found on Korea Brass' computers, and others were found in paper files.

65.    The stolen Drawing and Design Packages contained advanced designs of mechanical and electrical integration of MTH's trains.  Those Drawing and Design Packages included electro-mechanical and articulation details, information on the design of motors and gears, and other details about form, fit, and function.

66.    The stolen Drawing and Design Packages contained design information on many of the mechanical advances that distinguish MTH trains from those sold by its competitors, including Lionel.

67.    Also stolen and found on hard drives at Korea Brass were 401 pages of MTH's R&D Technical Know-How, accumulated over years of research and development to assist in model train design, as well as 201 lost wax casting drawings.  Lost wax casting drawings are drawings for common details, such as whistles, that are applied to various model locomotives.

13

68.    The stolen files also contained information from MTH's confidential Production Schedule for the year 1999.

69.    MTH believes, and therefore avers, that the stolen files also contained information from MTH's confidential Production Schedule for the year 2000 as well as MTH's proposed product list and Production Schedule for the year 2001.

70.    Yang informed Lionel that one of the designers who was jailed for stealing MTH's trade secrets has hidden materials, including a directory listing of MTH's projects from Samhongsa's computer files.  Accordingly, MTH believes, and therefore avers, that Yang, Korea Brass, and Lionel have access to additional stolen trade secrets that were not recovered.

## Korea Brass And Lionel Try To Cover Their Tracks

71.    Sometime in late September 1999, Yang, Korea Brass and Lionel came to believe that MTH and Samhongsa were suspicious of Korea Brass and Lionel's actions.

72.    On October 12 and 13, 1999, Yang and Korea Brass Representative Director Sung-Won Cho visited Lionel in Michigan.  During that visit, Yang and Sung-Won Cho delivered diskettes to Lionel containing CAD drawings for a Scale Norfolk & Western ("N&W") Class A engine, which Korea Brass had begun working on for Lionel.

73.    The CAD drawing diskettes delivered to Lionel by Yang and Sung-Won Cho undoubtedly contained information from MTH's stolen Drawing and Design Packages, as evidenced by the fact that CAD drawings on these diskettes were originated at the precise moment in time as CAD drawings for MTH's N&W Class A.  Moreover, several of the CAD drawings on these diskettes were originated in 1997 and 1994, long before Korea Brass and Lionel had established any relationship.

14

74.    During Yang's and Sung-Won Cho's visit to Lionel on October 12 and 13, 1999, Yang downloaded the information from the Class A CAD diskettes onto the computer of Lionel employee Steven Greening, and Greening shared the files with another Lionel employee, Steve Davis.

75.    Greening and Davis were not among the small group of individuals at Lionel who were supposed to have access to those files, and Yang and Sung-Won Cho were very worried that MTH would learn about those files.

76.    In an effort to cover their tracks, on October 20, 1999, by e-mail, Yang requested Lionel to "Please cover my mistake" by deleting files containing the information from above referenced Class A CAD diskettes from Greening's and Davis' computers.

77.    In a further effort to cover their tracks, on October 28, 1999, Yang, at the direction of Sung-Won Cho, requested Lionel to send Korea Brass a false purchase order for Lionel's N&W Class A model train, dated May 1999.

78.    Sung-Won Cho wanted to use the false purchase order to trick people into believing that Korea Brass actually had begun working on Lionel's N&W Class A model train in May 1999 when, in fact, that was not the case.

79.    On October 29, 1999, after the Class A CAD diskettes had been at Lionel for over two weeks, Steve Ziemba, Lionel's project engineer on the Class A, requested Yang to send him CAD drawings for the Class A so he could review them and offer suggested changes before the tooling was completed.

80.    Lionel contends work began on its N&W Class A in April 1999.  Yang and Korea Brass contend work began in mid-July 1999.  Neither date is supported by any evidence.

81.    Contrary to the contentions of Lionel, Korea Brass, and Yang, Lionel requested the Class A to be quoted and started in August 1999. The tooling for Lionel's Class A also was started in August 1999. Thus, there was no time for either Korea Brass or Lionel to prepare designs for the Class A.

## Korea Brass Manufactures Trains for Lionel Using MTH's Stolen Secrets

82.    Since at least November 1998, Korea Brass has manufactured model trains for Lionel utilizing MTH's stolen Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information, and Lionel has agreed to purchase those model trains from Korea Brass for importation into the United States and the State of Michigan, for sale into interstate commerce.

83.    Thus, Lionel was able to avoid the necessary lead time that is required to design, manufacture, and market realistic looking die-cast metal model trains like those sold by MTH, and erase any lead time advantage MTH had by virtue of keeping its Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information secret.

## A Comparison of MTH's and Lionel's Production

84.    In the last several years, MTH has manufactured and sold in interstate commerce numerous model trains, including, but not limited to, RailKing Hudson/Pacific Engines, C&O Allegheny Steam Engines, Union Pacific Big Boy Steam Engines, N&W Class A Steam Engines, and RailKing K-4 Engines.

85.    On the above engines, MTH spent a combined total of over $1,750,000 to develop designs and tooling alone.

86.    On the exact same projects, Lionel spent approximately $980,000 for designs and tooling.

16

87.     Since September 1999, Lionel has imported from Korea Brass into the United States and the State of Michigan, for sale in interstate commerce, the following model trains, among others:

        (a)     in or about September 1999, Lionel imported approximately 1,686 C&O Allegheny model trains;

        (b)     in or about November 1999, Lionel imported approximately 6,500 Baby Hudson model trains and approximately 4,850 Pacific model trains;

        (c)     in or about December 1999, Lionel imported approximately 2,003 Big Boy #4006 model trains;

        (d)     in or about January 2000, Lionel imported approximately 4,046 more Baby Hudson model trains and approximately 1,006 more Pacific model trains;

        (e)     in or about February 2000, Lionel imported approximately 700 N&W Class A model trains;

        (f)     on or about March 26, 2000, Lionel imported approximately 1,440 more N&W Class A model trains;

        (g)     in or about March 2000, Lionel imported approximately 2,510 more Baby Hudson model trains; and

        (h)     in or about April 2000, Lionel imported approximately 1,356 Pennsylvania Railroad ("PRR") K-4 model trains.

88.     All of the foregoing model trains manufactured by Korea Brass for Lionel are based on MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information for those same models manufactured by Samhongsa exclusively for MTH.

17

89.    If it has not done so already, Lionel plans to import into the United States and the State of Michigan, for sale into interstate commerce, the following model trains:

(a)    approximately 1,653 Shay model trains;

(b)    approximately 1,266 Mikado model trains;

(c)    approximately 2,012 EM-1 model trains;

(d)    approximately 7,560 Baby Hudson model trains;

(e)    approximately 1,800 Hiawatha model trains;

(f)    approximately 2,006 USRA 4-8-4 model trains;

(g)    approximately 2,200 Challenger model trains;

(h)    approximately 2,203 AT&SF 2-10-4 Berkshire model trains;

(i)    approximately 2,103 USRA 2-8-8-2 Y6B model trains;

(j)    approximately 2,300 PRR T-1 model trains;

(k)    approximately 2,500 Texas 2-8-4 model trains;

(l)    approximately 2,503 USRA Heavy model trains;

(m)    approximately 3,000 Class A Auxiliary Tenders; and

(n)    approximately 4,006 NYC Cabooses; and

(o)    an unspecified number of Scale Hudson model trains.

90.    All of the model trains identified in paragraphs 87 and 89 were, or will be, manufactured for Lionel by Korea Brass.

91.    During calendar year 1999 and through January 30, 2000, Lionel imported over $3,300,000 worth of model trains from Korea Brass, and plans to import over $11,700,000 worth of model trains from Korea Brass in calendar year 2000.

92.    In manufacturing and scheduling the release of the above referenced model trains, Lionel, Korea Brass, and Yang have used and continue to use MTH's stolen trade

18

secrets, including but not limited to MTH's Drawing and Design Packages, Production

Schedules, R&D Technical Know-How, and Cost Information.

93.    Lionel, Korea Brass, and Yang knew or, at the very least, had reason to

know that all of the model trains manufactured or scheduled to be manufactured for it by Korea

Brass were based on or were the product of MTH's stolen trade secrets, including but not limited

to MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How,

and Cost Information.

94.    Even if Lionel did not know or have reason to know that the model trains

manufactured or scheduled to be manufactured for it by Korea Brass were based on or were the

product of MTH's stolen trade secrets, Lionel and Korea Brass were and are partners and/or joint

venturers and/or affiliates, as evidenced by the name plate on the Korea Brass factory bearing the

name "Lionel" and Lionel's registered trademark stylized capital letter "L."  As such, Korea

Brass' knowledge is imputed to Lionel, and Lionel is vicariously liable for Korea Brass'

misappropriation of Lionel's trade secrets, including but not limited to MTH's Drawing and

Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information.

## Korean Authorities Investigate Theft Of MTH's Trade Secrets

95.    In or about September 1999, Lionel released its C&O Allegheny Steam

Engine model, which looked identical or substantially similar to MTH's C&O Allegheny Steam

Engine model.

96.    Not only did Lionel's C&O Allegheny model look identical or

substantially similar to MTH's C&O Allegheny model, the two models also appeared to have a

similar tool construction.

19

97.    In or about October 1999, after a thorough examination of Lionel's C&O Allegheny Steam Engine model, MTH and Samhongsa determined that Lionel's model had the same design signature as MTH's C&O Allegheny Steam Engine model.

98.    At the request of MTH and Samhongsa, in or about January 2000, Korean authorities began to investigate the possible theft of MTH's designs and drawings from Samhongsa's facilities.

99.    In or about February 2000, Korean authorities raided Korea Brass' factory and found MTH's and Samhongsa's stolen trade secrets.

100.    In or about February 2000, four persons, former Samhongsa employees Soon-Kap Ahn, Bok-Dong Jeung, and Byong-Ki Kwak; and Korea Brass employee, Heung-Bo Shim, were charged with stealing MTH's trade secrets from Samhongsa's facilities in violation of Korea's Prevention of Unfair Competition and Trade Secret Protection Law.

101.    At the time he was charged with stealing MTH's trade secrets, Bok-Dong Jeung was still employed by Samhongsa. His employment has since been terminated. While at Samhongsa, Bok-Dong Jeung was an engineer who worked on the designs for MTH's N&W Class A model Steam Engine.

102.    Soon-Kap Ahn was employed in Samhongsa's modeling department from approximately 1987 until September 1998, when he resigned his position to go to work for Korea Brass.

103.    Soon-Kap Ahn was recruited by Korea Brass' Representative Director Sung-Won Cho to work for Korea Brass as the person in charge of Korea Brass' outside order design work for miniature trains.

104.    From about early January 1999 until about late July 1999, Soon-Kap Ahn worked for Korea Brass and Lionel from his home.

20

105.    From about early August 1999 until about November 1999, Soon-Kap Ahn worked at Korea Brass' office.

106.    In or about November 1999, fearing that information regarding MTH's and Samhongsa's stolen trade secrets had leaked and Korean authorities might raid Korea Brass, Korea Brass moved Soon-Kap Ahn's operation to an underground office away from Korea Brass, and Korea Brass deleted all e-mail correspondence from its computers.

107.    Soon-Kap Ahn admitted stealing and/or was caught with MTH's designs and other materials, and using those materials to manufacture trains for Korea Brass and Lionel.

108.    Specifically, Soon-Kap Ahn stole and used materials relating to the following MTH trains:  Scale Allegheny, RailKing Allegheny, Scale Union Pacific Big Boy, Scale N&W Class A, Scale Challenger, RailKing Challenger, Scale Hudson, RailKing Hudson/Pacific, Scale PRR T-1, RailKing PRR K-4, Scale Class A Auxiliary Tender, Scale Big Boy Auxiliary Tender, Scale Shay, Tinplate 263 Steamer, Tinplate 392E Steamer, and Tinplate Hiawatha.

109.    In addition, Soon-Kap Ahn admitted stealing and/or using MTH's lost wax casting drawings, general technical design reference materials, and gear velocity ratio data, all of which are MTH and/or Samhongsa trade secrets.

110.    On or about March 23, 2000, Soon-Kap Ahn, Bok-Dong Jeung, Byong-Ki Kwak, and Heung-Bo Shim all admitted their guilt of the crimes charged.

111.    On or about April 7, 2000, Soon-Kap Ahn and Bok-Dong Jeung were sentenced to ten (10) months in prison, and Byong-Ki Kwak, and Heung-Bo Shim were sentenced to eight (8) months in prison.  The sentences of Bok-Dong Jeung, Byong-Ki Kwak, and Heung-Bo Shim were stayed for two (2) years and each of them was ordered to serve probation for that period of time.

21

## Korean Authorities Seize 1,440 N&W Class A Model Trains From Korea Brass

112.    On or about February 25, 2000, Korean authorities seized 1,440 N&W Class A Steam Engines ("N&W Engines") manufactured by Korea Brass for Lionel on the ground that they were the product of MTH's stolen trade secrets. The N&W Engines were in the port of Pusan, Korea, awaiting transportation to Lionel in the United States at the time they were seized.

113.    Under the Korean procedure, Korea Brass was required to pay the Korean authorities cash in an amount equivalent to approximately $900,000 to have the N&W Engines released to Korea Brass for shipment to the United States.

114.    On or about March 22, 2000, Korea Brass paid the cash, and all 1,440 N&W Engines were released to Korea Brass.

115.    On or about March 25, 2000, Korea Brass shipped all 1,440 N&W Engines to Lionel by air freight from Korea to Michigan.

116.    On or about March 27, 2000, all 1,440 N&W Engines were moved by ground transportation to Lionel's facilities in Chesterfield, Michigan.

## MTH Notifies Lionel Of The Stolen Trade Secrets

117.    On or about March 6, 2000, MTH directed its counsel to send a letter (the "March 6th Letter") informing Lionel that Korea Brass had used MTH's stolen trade secrets to manufacture trains for Lionel, including, but not limited to, the N&W Engines, that the N&W Engines had been seized by Korean authorities, and requesting Lionel to refrain from importing, selling, and/or distributing the N&W Engines. A true and correct copy of the letter from MTH's counsel to Lionel dated March 6, 2000 (the "March 6th Letter") is attached hereto as Exhibit A, and is incorporated by reference as though set forth fully herein.

22

118.    MTH waited until March 6, 2000 to notify Lionel that Korea Brass used MTH's stolen trade secrets for Lionel's trains because MTH only became aware of the results of the Korean investigation in late February. Prior to that time, MTH was not aware of any hard evidence from which it could claim Korea Brass had stolen its trade secrets.

119.    By March 6, 2000, Lionel had invested only $195,000 in the N&W Engines.

120.    On or about March 14, 2000, after receiving MTH's March 6th Letter, Lionel paid Korea Brass an additional $900,000 for the N&W Engines. Lionel made the final payment of $40,980 for the N&W Engines on or about April 6, 2000.

121.    On or about March 21, 2000, Yang informed Lionel that, "All the projects with contaminated designs can be retooled. This can be done without cost to Lionel as long as our tool maker can breathe for a while."

122.    On or about March 24, 2000, when MTH learned that Lionel was planning to import the seized N&W engines, MTH directed its counsel to send another letter (the "March 24th Letter") informing Lionel that Korea Brass had used MTH's stolen trade secrets to manufacture trains for Lionel, including, but not limited to, the N&W Engines, and that Lionel's top management may have been aware that these trains were the product of stolen trade secrets. A true and correct copy of the March 24th Letter is attached hereto as Exhibit B, and is incorporated by reference as though set forth fully herein.

123.    The March 24th Letter, among other things, demanded that Lionel refrain from selling any of the N&W Engines to customers, and advised Lionel of MTH's intent to take legal action if Lionel refused to comply with MTH's demand.

124.    Despite MTH's demands, and the unequivocal admission by Korea Brass that its designs were contaminated, Lionel imported the N&W Engines and shipped them to

23

customers, and continued to proceed with its plans to import and sell other model trains from Korea Brass.

## Korean Authorities Seize Additional Trains From Korea Brass

125. On or about May 20, 2000, the Seoul District Court in Seoul, Korea entered an order authorizing Korean authorities to seize from Korea Brass the following model trains on the ground that they are the product of stolen trade secrets: PRR T-1, Starter Set Hudson, Scale Hudson, and Scale Shay.

126. The seizure order was based on additional evidence supplied by Samhongsa to the Korean Court.

127. Korean authorities seized Scale Shay engines, but did not find any T-1 or Hudson model trains at Korea Brass' factory. To date, Korean authorities have not been able to locate the T-1s or Hudsons and continue to look for them. MTH believes and, therefore avers, that Korea Brass has arranged to hide these trains in an underground factory and/or warehouse to avoid the Korean Court's seizure order.

128. Based on the foregoing, Lionel, Korea Brass, and Yang have misappropriated MTH's trade secrets, in violation of the Uniform Trade Secrets Act ("UTSA"), as codified in Michigan and elsewhere, and/or common law. See MICH. STAT. ANN. §§ 19.901-19.910.

129. Lionel, Korea Brass, and Yang have profited from the sale of numerous model trains that were the byproduct of MTH's misappropriated trade secrets.

130. In addition, the use of MTH's misappropriated trade secrets by Lionel, Korea Brass, and Yang has caused and will continue to cause MTH irreparable harm, including but not limited to:

Auxiliary Tender, Scale Big Boy Auxiliary Tender, Scale Shay, Tinplate 263 Steamer, Tinplate 392E Steamer, Tinplate Hiawatha; Scale GP-30; Scale SD-45; Scale SD-7/9; Scale Gas Turbine; Baby F-3; Baby Dash-8; Baby SD-60; Scale FP-45; Baby UP Gas Turbine; Baby SD-90 Mac; Scale UP DD40X; Baby L-3 Tender; Scale NYC Empire State Express; Baby N&W J; Baby Southern Crescent; Baby Hiawatha; Scale 70-ft. Passenger Car Set; Scale ATSF 4-8-4; Scale NYC Hudson 4-6-4; Scale PRR K-4; Scale SP Cab Forward; Scale Daylight GS-4; Scale DM&IR 2-8-8-4; Scale N&W J; Scale New Jersey Blue Comet; Scale Southern PS4; Scale USRA Y3; Scale USRA Y6B; Baby Big Boy; Baby NYC J3A; Baby Berkshire 2-8-4; Baby Commodore Vanderbilt; Baby General 4-4-0; Baby General Texas 4-4-0; Baby NYC L-3; Baby SP Daylight GS-4; Baby SP Daylight GS-4 auxiliary tender; Baby Torpedo; B&O EM-1; and ATSF 2-10-4.

134.   In addition, Lionel, Korea Brass, and Yang should be compelled to return to MTH all of MTH's trade secrets in their possession, including, but not limited to, MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information.

135.   Lionel, Korea Brass, and Yang should be compelled to forfeit all products, including, but not limited to, tooling and tooling drawings, based on, derived from, or a result of defendants' possession and/or knowledge of MTH's trade secrets, including, but not limited to, MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information.

136.   Lionel, Korea Brass, and Yang also should be compelled to forfeit to MTH all of their profits from the sale of model trains manufactured by Korea Brass that were based on or the product of MTH's stolen trade secrets.

137.    Finally, Lionel, Korea Brass, and Yang should be compelled to pay MTH compensatory damages, in an amount to be proven at trial, for the harm MTH has suffered as a result of Lionel's misappropriation of MTH's trade secrets.

### SECOND CLAIM FOR RELIEF
**Unfair Competition — Misappropriation of Products**
**(Against Defendant Lionel Only)**

138.    MTH incorporates by reference paragraphs 1 through 137 above as though fully set forth herein.

139.    MTH spent time, labor, and money in creating model train designs with more detail and newer features than its competitors, including but not limited to the designs of the model trains identified in paragraph 133 above.

140.    MTH and Lionel were and are direct competitors in the model train market.

141.    The sale by Lionel of trains manufactured for it using MTH's stolen Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information has damaged and will continue to damage MTH, including causing lost sales, lost profits, and other compensatory damages totaling more than $4,700,000.

142.    The sale by Lionel of trains manufactured for it using MTH's stolen Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information has caused and continues to cause confusion in the model train market regarding the origin, sponsorship, ownership, approval, and/or affiliation of Lionel's model trains with those model trains sold by MTH.

27

143.    MTH has been and continues to be damaged by the confusion in the model train market regarding the origin, sponsorship, ownership, and/or affiliation of Lionel's model trains with those model trains sold by MTH.

### THIRD CLAIM FOR RELIEF
#### Unfair Competition — Lanham Act, 15 U.S.C. § 1125(a)
#### (Against Defendant Lionel Only)

144.    MTH incorporates by reference paragraphs 1 through 143 above as though fully set forth herein.

145.    The acts alleged above violate the provisions of the Lanham Act, 15 U.S.C. § 1125(a), which makes it unlawful to engage in unfair competition that is likely to cause confusion regarding the origin, sponsorship, ownership, and/or affiliation of one's goods with those of another.

### FOURTH CLAIM FOR RELIEF
#### Korea's Prevention of Unfair Competition and Trade Secret Protection Law
#### (Against All Defendants)

146.    MTH incorporates by reference paragraphs 1 through 145 above as though set forth fully herein.

147.    Lionel's, Korea Brass, and Yang's misappropriation of MTH's trade secrets and sale of model trains that are the product of MTH's misappropriated trade secrets are violations of Korea's Prevention of Unfair Competition and Trade Secret Protection Law ("PUCTSPL").

148.    Under the PUCTSPL, Lionel, Korea Brass, and Yang should be compelled to destroy all of the model trains that were manufactured through the use of MTH's trade secrets, and MTH is entitled to receive the profits of Lionel, Korea Brass, and Yang from the sale of any such model trains sold by Lionel, and receive compensation for the damages it has suffered as a result of Lionel's, Korea Brass, and Yang's misappropriation of its trade secrets.

28

## FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

149.    MTH incorporates by reference paragraphs 1 through 148 above as though set forth fully herein.

150.    By acquiring MTH's trade secrets and by receiving, selling and continuing to sell model trains that are based on or the product of MTH's misappropriated trade secrets, Lionel, Korea Brass, and Yang have received a benefit from MTH.

151.    Lionel, Korea Brass, and Yang appreciate and/or have knowledge of the benefit conferred on it by MTH.

152.    Under the circumstances of this case, it would be inequitable for Lionel, Korea Brass, and Yang to accept or retain the benefit conferred on them by MTH without paying MTH the value of the benefit conferred.

———

WHEREFORE, based on the foregoing, MTH prays:

A.    For issuance of a preliminary and permanent injunction enjoining all defendants and their agents, servants and/or employees from taking any actions that would result in the sale, distribution, or transfer of any and all model trains that are based on, derived from, or a result of their possession and/or knowledge of MTH's trade secrets, including but not limited to the model trains identified in Paragraph 133 above;

B.    For issuance of a preliminary and permanent injunction enjoining all defendants and their agents, servants and/or employees from beginning or continuing the design, production, and/or marketing of any model trains that are based on, derived from, or a result of

29

their possession and/or knowledge of MTH's trade secrets, including but not limited to the model trains identified in Paragraph 133 above;

     C.    For issuance of a preliminary and permanent injunction enjoining all defendants and their agents, servants and/or employees from destroying any evidence relating to the claims asserted herein, including but not limited to computer files, electronic mail communications, drawings, design specifications, tooling, production schedules, purchase orders, and other materials;

     D.    For an order granting the parties expedited discovery and an expedited final hearing and/or trial in this matter;

     E.    For an order compelling all defendants and their agents, servants and/or employees to forfeit all products, including, but not limited to, tooling and tooling drawings, that are based on, derived from, or a result of defendants' possession and/or knowledge of MTH's trade secrets, including, but not limited to, MTH's Drawing and Design Packages, Production Schedules, R&D Technical Know-How, and Cost Information.

     F.    For an order compelling all defendants to pay MTH an amount equal to all of their profits from the sale, distribution, or transfer of any and all model trains based on, derived from, or a result of their possession and/or knowledge of MTH's trade secrets;

     G.    For an award of compensatory damages against all defendants, and each of them jointly and severally, in an amount to be proven at trial;

     H.    For an award of unjust enrichment damages against all defendants, and each of them jointly and severally, in an amount to be proven at trial;

     I.    For an award of exemplary and/or punitive damages against all defendants, and each of them jointly and severally, in an amount to be proven at trial;

     J.    For an award of attorney's fees;

08/25/00/SL1 73039v1/35063.003

K.   For the reasonable costs of this lawsuit; and

L.   For any such other relief to which MTH is entitled or the Court deems

appropriate.

_August 28, 2000_
Date

Harold Gurewitz (P14468)
Margaret M. Raben (P39243)
GUREWITZ & RABEN, P.C.
333 West Fort Street, Suite 1100
Detroit, Michigan 48226
(313) 628-4740

Charles J. Bloom
STEVENS & LEE, P.C.
One Glenhardie Corporate Center
1275 Drummers Lane
Wayne, Pennsylvania 19087-0236
(610) 293-4973

Jeffrey D. Bukowski
STEVENS & LEE, P.C.
111 North Sixth Street
Reading, PA 19603-0679
(610) 478-2215

Attorneys for Plaintiff,
Mike's Train House, Inc.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all counts.

31

## VERIFICATION

I HEREBY CERTIFY under the penalty of perjury that the contents of the foregoing First Amended Complaint are true and correct to the best of my knowledge, information, and belief.

_6/9/00_
Date

_____
Michael P. Wolf

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED